THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| A.V. and M.V., on behalf of B.V., | : | HON. JEROME B. SIMANDLE |
| Plaintiffs, | : | Civil No. 06-1534 (JBS) |
| v. | : | |
| BURLINGTON TOWNSHIP BOARD OF EDUCATION, | : | **OPINION** |
| Defendant. | : | |

APPEARANCES:

John B. Comegno, II, Esq.
Kimberly A. Eger, Esq.
COMEGNO LAW GROUP, P.C.
521 Pleasant Valley Avenue
Moorestown, NJ 08057
    Attorneys for Plaintiffs A.V. and M.V., on behalf of B.V.

James Schwerin, Esq.
Paul C. Kalac, Esq.
PARKER MCCAY, P.A.
1009 Lenox Drive
Suite 102A
Lawrenceville, NJ 08648
    Attorney for Defendant Burlington Township Board of
    Education

**SIMANDLE**, District Judge:

    Plaintiffs A.V. and M.V. bring this action on behalf of

their minor child B.V. (the "Plaintiffs") against the defendant

Burlington Board of Education (the "Board") pursuant to the

Individuals with Disabilities Educational Improvement Act

("IDEIA"), 20 U.S.C. § 1400 et seq.,[1] as an appeal of the final

_____

    [1] Formerly known as the IDEA, which name is used in many of
the cases cited.

Dockets.Justia.com

administrative decision of January 6, 2006 by the Honorable Jeff S. Masin, New Jersey Administrative Law Judge (the "ALJ's Order"). In the state administrative proceeding, the parents of B.V. challenged the Individualized Education Plan ("IEP") created for their child for the 2004-2005 and 2005-2006 school years and sought placement of B.V. out-of-district (specifically, at the Newgrange School in Princeton, New Jersey).

Presently before the Court are cross-motions for summary judgment filed by both Plaintiffs and the Board. The cross-motions pertain to the four-count complaint ("the Complaint") in which Plaintiffs seek: (1) attorneys fees and costs as the prevailing party at the administrative level; (2) a ruling that the administrative law judge ("ALJ") erred in failing to place B.V. out-of-district; (3) a ruling that the ALJ erred in failing to place B.V. in Newgrange School since the nature and severity of B.V.'s disabilities require an out-of-district placement; and (4) an order stating B.V. should be placed at Newgrange School immediately at the Board's expense because the Board failed to comply with the ALJ's Order.

For the reasons stated below, the Court will grant in part and deny in part Plaintiffs' motion for summary judgment and grant in part and deny in part the Board's motion for summary judgment. First, the Court holds that Plaintiffs are a "prevailing party" entitled to attorneys' fees for the

2

administrative phase.  However, given the moderate success at the administrative level, the Court will reduce Plaintiffs' requested amount of attorneys' fees by one-half.[2]  Second, the Court will deny Plaintiffs' motion in part and hold that the ALJ did not err when he declined to order that B.V. be placed out-of-district at Newgrange School.  Plaintiffs simply have not met their burden of proof that the challenged IEPs were not reasonably calculated to confer a meaningful educational benefit on B.V. and that B.V. could not receive a free and appropriate public education in the least restrictive environment within the district.

Finally, the Board has failed to oppose Plaintiffs' motion seeking to have B.V. placed immediately at Newgrange School and Plaintiffs have demonstrated that the Board has failed to comply

---

[2]  As explained in more detail in Section II.A infra, this Court will grant Plaintiffs a partial fee award, analyzing whether Plaintiffs are entitled to attorneys' fees and costs only for fees and costs incurred at the administrative level.  As discussed below in the Opinion, Plaintiffs' degree of success before this Court remains an open question and the Court will require Plaintiffs to submit a fee application for all attorneys' fees and costs incurred in all matters before this Court at a later date.  Thus, at this stage in the litigation the Court will determine whether to award Plaintiffs' attorneys' fees of $29,953.94, reflecting fees and costs incurred at the administrative level rather that $69,922.22, which Plaintiffs state reflect their fees and costs incurred both at the administrative level and in proceedings before this Court.  The $29,953.94 total was calculated by (1) adding all fees and costs incurred from September 30, 2004 through January 19, 2006 (at which point Plaintiffs' counsel's work at the administrative level concluded) which totaled $30,003.04 and (2) subtracting certain expert fees (totaling $150) for which Plaintiffs cannot recover, discussed in footnote 4, infra.

3

with the ALJ's Order in many respects.  Although unopposed, the
Court does not deem it appropriate to order Plaintiffs' requested
relief of a specific out-of-district placement despite the fact
that the Board does not appear to be complying with the ALJ's
Order.  However, the Court will order that the Board immediately
comply with the ALJ's Order to make certain determinations about
the district's ability to provide B.V. with support ordered by
the ALJ, and to provide the services therein ordered, and to
provide Plaintiffs with compensatory services for the services
the Board neglected to provide to B.V. during the Spring semester
of 2006 following the ALJ's Order, as explained below.

I.    **BACKGROUND**

   A.    **The 2002-2003 and 2003-2004 School Years**

   B.V. was born on July 1, 1997 as one of three triplets.
Concerns about his development arose early.  During his pre-
school years, B.V. was classified as pre-school disabled and
received speech therapy twice a week in his home.  When B.V. was
five years old, he entered kindergarten in Burlington Township,
New Jersey.  At the conclusion of the 2002-2003 school year (his
kindergarten year), B.V. was classified as Multiply Disabled.

   B.V. entered the first grade in the 2003-2004 school year.
B.V.'s mother noticed that at home, B.V. could see a word and
break the word down into its phonemes, but could not then "sound
out" or blend those phonemes together to read the word.  B.V.'s

4

mother began to observe B.V.'s class on a regular basis and noticed that B.V. had serious attention problems and would often "space out" during class. Because of B.V.'s attention issues, M.V. took B.V. to a pediatric neurologist, Dr. Chester Minarcik, M.D. in April of 2004. Dr. Minarcik diagnosed B.V. with attention deficit disorder.

Also in April of 2004, B.V's IEP team met. In the "Present Levels of Educational Performance" section of the IEP, the team noted that B.V.'s grade equivalent in language arts in October 2003 was pre-school ninth month but by February 2004, his grade equivalent had dropped to pre-school seventh month. Thus, B.V. had regressed over the school year. According to Ms. Sherrie Wexler, B.V.'s case manager, B.V.'s parents did not object to the April 2004 IEP and the IEP was implemented.

Following the April 2004 IEP evaluation results, B.V. was evaluated by no less than six experts in the next seven months.

- <u>Evaluation by Dr. James Priest, Ph.D.</u> In June, 2004, B.V, was evaluated by an independent psychologist hired by B.V.'s parents. In his report, Dr. Priest found that B.V.'s "ability to scan and discriminate figural information under timed conditions was borderline" and this weakness "may impact on reading fluency." Dr. Priest concluded that B.V. "has average ability and should be making better progress" and that he "functions better in individualized contexts [requiring] more one-on-one support in school." (Pl.'s Br. at Ex. 6.)

- <u>Evaluation by Allyn McLaughlin, M.Ed.</u> In July, 2004, B.V. received an educational assessment from Allyn McLaughlin. With respect to his ability to read, McLaughlin found that B.V.:

> has some awareness of letter sounds but
> is not able to utilize them to
> efficiently decode words . . . . When
> listening to sounds of consonants,
> [B.V.] is able to identify most. He has
> more difficulty with matching the visual
> letter with the sound it makes. Given
> this weakness, [B.V.] is not successful
> at decoding. His current reading skills
> suggest a need for further remediation
> in all aspects of reading.

(Pl.'s Br. at Ex. 7, Allyn C. McLaughlin, M.Ed.
Educational Assessment at 4.)

• <u>Second evaluation by Dr. Minarcik.</u>  In September, 2004,
  B.V. received another evaluation from Dr. Minarcik who
  diagnosed B.V. with Dyslexia.  (Pl.'s Br. at Ex. 8).

• <u>Evaluation by Linda Gross, Ed.M.</u>  In October of 2004,
  B.V. was evaluated by certified reading specialist Linda
  Gross, Ed.M.  Ms. Gross found that B.V. was "a non-
  reader."  Although B.V. recognized two sight words from
  a pre-primer list, he did not know the vowel sounds and
  was unable to decode two-letter words even after the
  sounds of the letters had been taught to him and
  reviewed.  Ms. Gross stated that B.V. required "a VAKT
  (visual, auditory, kinesthetic and tactile) approach to
  reading . . . ."  Ms. Gross also warned that it was
  "imperative that [phonemic awareness skills] be taught or
  [B.V.] will remain a non-reader."  (Pl.'s Br. at Ex. 9,
  Linda Gross, Ed.M. Report at 1.)

• <u>Evaluation by Sherrie Wexler.</u>  In November of 2004,
  B.V.'s case manager Sherrie Wexler conducted a
  psychoeducational assessment in which Ms. Wexler
  confirmed that B.V. was "unable to read."  Ms. Wexler
  also noted that B.V. "demonstrated a weakness in blending
  sounds."  (Pl.'s Br. at Ex. 11, Psychoeducational
  Assessment of Sherrie L. Wexler at 5-6.)

• <u>Evaluation by Ted Silber.</u>  In December of 2004, school
  psychologist Ted Silber conducted a psychological
  evaluation of B.V.  Mr. Silber reported that B.V.'s
  scores on tests for rapid automatic naming and
  phonological skills (both "critical components of reading
  ability) are "moderately below average and below average,
  respectively."  Despite average intelligence, B.V. ranked

in the fifth percentile for both Word Reading and
Pseudoword Decoding. (Pl.'s Br. at Ex. 12, Burlington
Township Schools Child Study Services Psychological
Evaluation.)

**B.**   **The 2004-2005 School Year**

During B.V.'s second grade year, the Board "mainstreamed"
him for social studies and science instruction by combining
B.V.'s self-contained class with a general education class.
According to M.V., B.V. struggled in this environment.  In mid-
December of 2004, the Child Study Team conducted a required re-
evaluation of B.V. and created a new IEP to remain in effect for
the remainder of B.V.'s second grade.  B.V.'s parents requested
three hours per day of individualized reading instruction.  The
Child Study Team, however, only called for forty minutes per day
of one-on-one reading instruction.  The Child Study Team revised
their position somewhat in January of 2005 after the Child Study
Team accepted the evaluations of B.V. as well as the diagnosis of
Dyslexia.  With this, the Child Study Team agreed to provide B.V.
with additional, individual twenty-minute sessions with the
Earobics Literacy Program.

According to Ms. Donna Baldwin, a reading specialist who
worked with B.V., these services were provided from January
through June of 2005.  In her deposition, Ms Baldwin admitted
that she didn't "normally work with students with special needs"
and that she never reviewed the Board's psychological assessment
outlining B.V.'s needs or any other independent assessments

(including Linda Gross' assessment).  Moreover, Ms. Baldwin
stated that she was unaware of B.V.'s processing speed
difficulties.

Near the end of B.V.'s second-grade-year (in April, 2005),
the IEP team met again to discuss B.V.'s third-grade IEP.
Although B.V. completed second grade, the "Present Levels of
Educational Performance" identified B.V.'s math grade equivalent
as first grade, two months and his reading grade equivalent as
kindergarten, eighth month.  On the Wechsler Individual
Achievement Tests, B.V.'s word reading, reading comprehension,
and pseudoword decoding were all disturbingly low, registering at
the eighth, tenth, and thirteenth percentiles, respectively.
After reviewing this information, the Child Study Team decided to
cancel the forty minutes of individualized reading instruction
for the 2005-2006 school year.

B.V.'s parents rejected the IEP and requested out-of-
district placement.  In support their claim for an out of
district placement, B.V.'s parents secured another independent
evaluation, that of neuropsychologist Dr. Gail Silverstein, Ph.D.
Dr. Silverstein administered numerous tests to B.V., concluding
that B.V. "demonstrates a severe mixed learning disability with
both language-based and non-verbal components, significant
attentional problems, articulation problems, and fine motor
problems."  Dr. Silverstein also mentioned that B.V. had

8

completed second grade but "is still unable to decode any words at all or to express himself in writing" and that he is in "dire need of appropriate reading instruction." Dr. Silverstein noted B.V.'s severe attentional problems, processing speed problems, and fatigue. Overall, she recommended that:

- B.V. have at least two hours/day of intensive reading instruction with a research-based, multi-sensory phonics-based method and should be taught by a trained instructor optimally in a one-to-one setting;

- Reading instruction should be integrated into the overall curriculum so as to maximize B.V.'s exposure to it;

- B.V. should have intensive and individualized instruction in writing in a one-on-one or small group setting;

- All reading instruction and other important academic skills should be taught in the morning before B.V. begins to fatigue; and

- B.V. should continue to get speech and occupational therapy services.

Dr. Silverstein testified that she knew of no public school that could implement all of these recommendations, including B.V.'s current placement. In light of her test results and B.V.'s needs, she recommended that he be placed at the Newgrange School, a school in Princeton New Jersey that could implement all of her recommendations. Dr. Silverstein testified to the curriculum of the Newgrange School despite having never visited Newgrange, stating only that she learned of Newgrange's ability to implement the curriculum she outlined for B.V. in a telephone

call she had with the Principal at Newgrange.  No one from Newgrange ever testified or provided any documents.

### C.  **Procedural History**

On September 19, 2005, Plaintiffs filed a Petition of Due Process with the New Jersey Department of Education, Office of Special Education Programs.  (Pl.'s Br. at Ex. 21.)   In their Petition of Due Process, Plaintiffs sought placement of B.V. at the Newgrange School, certain compensatory education and "[s]uch relief as the Court deems appropriate."  (Id. at 7.)  Plaintiffs also requested a hearing.  A resolution session was conducted on October 6, 2005 and the matter was transmitted to the ALJ for a hearing on October 20, 2005.  On November 29 and December 1, 2, and 3, the parties appeared before the Office of Administrative Law for a hearing.

### 1.  **The ALJ's Decision**

On January 5, 2006, ALJ Masin issued his written decision. See M.V. and A.V. o/b/o B.V. v. Burlington Twp. Bd. of Educ., OAL DKT. NO. EDW 08276-05s and AGENCY DKT. NO. 2006 10539.  (Pl.'s Br. at Ex. 1.)  The ALJ recognized that "[a]ll of the evidence presented here leads to the inevitable and undisputed conclusion that [B.V.] has a severe reading deficiency and also suffers from serious difficulty with math and written expression."  (Id. at 16.)  The ALJ summarized all of the relevant testimony from

10

B.V.'s parents, the individual evaluators and personnel at the school that worked with and/or evaluated B.V.  (Id. at 3 - 15.)

The ALJ concluded that the proper test in this case is not whether "the Board is providing the best possible measures to assure progress," but whether "the educational plan that it has chosen is one that is reasonably calculated to provide [B.V.] with meaningful benefit."  (Id.)  Indeed, according to the ALJ, the Board fails in its responsibility towards B.V. only if the plan it has implemented is "not reasonably calculated to deliver a measure of progress deemed reasonable and beneficial given the special needs and specific requirements of the student."  (Id. at 17.)  Second, if the Board "cannot supply the necessary program that will provide [a free and appropriate public education ("FAPE")] . . . then the question of where the child should be placed in order to receive the needed program becomes paramount." (Id. at 20.)

The ALJ concluded that the Board provided B.V. with a free and appropriate public education ("FAPE") for the 2004-2005 school year under the IDEIA, concluding that for these school years "there can be no argument that the conceptual framework was at least significantly that which [B.V.] appeared to require." (Id. at 21.)  The ALJ cited the "credibl[e] testimony" of Ms. Baldwin that she in fact utilized a VAKT-type approach that incorporated multi-sensory aspects to the training with her work

with B.V.  Given the recommendations by B.V.'s parents' outside reading specialist (Linda Gross) that B.V. get three hours of individualized reading instruction per day, and the Board's extension of time to one hour per day, it "hardly seems appropriate to suggest that the Board did not provide [B.V.] with a program in the second half of 2004-2005 school year that was reasonably calculated to permit him to obtain meaningful progress."  (Id. at 22.)

However, with respect to the 2005-2006 school year, the ALJ held that "the IEP prepared in April 2005 [was] not reasonably calculated to provide [B.V.] with a meaningful educational benefit" pursuant to the IDEIA.  (Id. at 23.)  Noting that the Board eliminated the forty minute per day of reading with B.V., the ALJ concluded that he saw "no significant suggestion of such dynamic improvement occurring so as to support the abandonment of a course of instruction that seems to have been helping [B.V.]" The ALJ stated that the Board "must revise the IEP and provide [B.V.] with a meaningful educational benefit . . . [meaning that the Board] must revise the IEP and provide for [B.V.] to have daily session with a certified reading specialist for at least forty minutes a day."  (Id.)  In addition, the Board must "assure that [B.V.] receives a multi-sensory oriented program throughout his curriculum."  (Id.)  Finally, the ALJ ordered that "[i]f the

district is unable to provide this support in-district, it must
determine where such support may be provided." (Id.)

### 2. **Procedural History in the U.S. District Court**

Plaintiff alleges that the Board has failed to comply with
the ALJ's Order.  Thus, Plaintiff filed an appeal complaint with
this Court on March 31, 2006 [Docket Item No. 1], seeking an
order that (1) Plaintiffs are entitled to attorneys' fees and
costs due to their prevailing party status before the ALJ; (2)
the ALJ erred in failing to place B.V. out-of-district; (3) the
ALJ erred in failing to place B.V. in Newgrange School since the
nature and severity of B.V.'s disability require an out-of-
district placement; and (4) B.V. should be placed at Newgrange
School to accommodate his needs because the Board failed to
comply with the ALJ's Order to provide the needed supports, in-
district.

On June 8, 2006, the Board answered denying Plaintiff's
allegation and asserted a counterclaim against Plaintiffs.[3]
[Docket Item No. 3.]  On June 28, 2006, Plaintiffs answered the
counterclaim.  [Docket Item No. 5.]  Plaintiffs moved for summary
judgment. [Docket Item No. 10.]  Plaintiff's filed a cross-motion
for summary judgment.  [Docket Item No. 12.]  Briefing was

---

[3]  The Board's counterclaim seeks that this Court bar
Plaintiffs' receipt of attorneys' fees under 20 U.S.C. §
1415(i)(3)(D).  The Board's counterclaim is discussed in detail
in Section II.A.3., infra.

13

completed and the Court has considered all of the parties'
submissions without oral argument

## II.  **DISCUSSION**

### A.   **Plaintiffs' Application for Attorney's Fees**

In their motion, Plaintiffs argue that they are entitled to
summary judgment as to Count One of the Complaint because they
are the prevailing party at the administrative level.  Plaintiffs
argue that they prevailed before the ALJ because their Due
Process Petition ordered the revision of B.V.'s 2005-2006 IEP to
(1) restore the forty minutes per day of individualized work with
a certified reading specialist, (2) provide B.V. with a multi-
sensory oriented program throughout his curriculum, and (3)
determine if such support can be provided in-district.  Defendant
argues that Plaintiffs did not succeed in obtaining what they
sought, which was placement of B.V. out of the district at the
Newgrange School and therefore, are not prevailing parties.  In
the alternative, in its cross-motion for summary judgment,
Defendant argues that Plaintiffs are barred from receiving
attorneys' fees under 20 U.S.C. § 1415(i)(3)(D) which states that
no attorneys' fees will be awarded if the court finds that the
relief finally obtained by the parents is not more favorable to
the parents than the offer of settlement.

The Court views Plaintiffs' motion for summary judgment as to attorneys' fees to be an application for a partial fee award. That is, at this stage in the proceeding, the Court can gauge the degree of success that Plaintiffs have had at the administrative level, but cannot determine the degree of success Plaintiffs have had in proceedings before this Court (because, as discussed in Section II.C infra, the Court will order that the parties make additional submissions and hold a compliance hearing on the relief ordered herein on Count IV of the Complaint). Consequently, the Court's review of Plaintiffs' motion for attorneys' fees is limited to the administrative proceedings and fees and costs incurred by Plaintiffs from September 30, 2004 (the day of counsel's initial consultation with B.V.'s parents) through January 19, 2006 (the day it appears from counsel's certification that Plaintiffs' counsel began working on matters before this Court). (Pl.'s Br. at Ex. 23.)

Pursuant to 20 U.S.C. § 1415(i)(3)(B), "[i]n any action or proceeding brought under this section, the court, in its discretion, may award reasonable attorney's fees as part of the costs to the parents of a child with a disability who is the prevailing party." The Court's inquiry is two-pronged. First, the Court must determine whether the party is the prevailing party. If the party is the prevailing party, the Court must then determine the amount of fees and costs owed to the claimant. See

15

P.G. v. Brick Twp. Bd. of Educ., 124 F. Supp. 2d 251, 259 (D.N.J. 2000); S.D. v. Manville Bd. of Educ., 989 F. Supp. 649, 654 (D.N.J. 1998).

### 1. **Prevailing Party**

Under Buckhannon Bd. and Care Home, Inc. v. West Virginia Dept. of Health and Human Resources, 532 U.S. 598, 604 (2001), in deciding whether a party is a prevailing party, "enforceable judgments on the merits and court-ordered consent decrees create the 'material alteration of the legal relationship of the parties' necessary to permit an award of attorney's fees."  The party seeking attorney's fees -- here the Plaintiffs -- must "receive at least some relief on the merits of [their] claim before [they] can be said to prevail."  State Teachers' Assn. v. Garland Ind. Sch. Dist., 489 U.S. 782, 792 (1989).  In the Third Circuit, a court must determine whether: (1) the plaintiff obtained relief on a significant claim in the litigation; and (2) there is a causal connection between the litigation and the relief obtained from the defendant.  See Metro. Pittsburgh Crusade for Voters v. City of Pittsburgh, 964 F.2d 244, 250 (3d Cir. 1992); P.G., 124 F. Supp. 2d at 259.  "Most courts have permitted plaintiffs to recover attorneys' fees for success on the administrative level," in IDEIA cases.  P.G., 124 F. Supp. 2d

at 260 (citing <u>Field v. Haddonfield Bd. of Educ.</u>, 769 F. Supp. 1313, 1329 (D.N.J. 1991)).

###### a. <u>Whether Plaintiffs obtained relief on a significant claim</u>

To determine whether a party has met the first prong of the prevailing party test, the court "compares the relief the plaintiff sought from the lawsuit with the relief eventually obtained." <u>P.G.</u>, 124 F. Supp. 2d at 260. The party must demonstrate it has prevailed on "any significant claim affording some of the relief sought." <u>State Teachers' Assn.</u>, 489 U.S. at 792. The success must affect the behavior of the adverse party toward the petitioner. <u>See</u> <u>Hewitt v. Helms</u>, 482 U.S. 755, 761 (1987). Success that is <u>de</u> <u>minimis</u> may not warrant a fee. <u>State Teachers' Assn.</u>, 489 U.S. at 791. A plaintiff will be a prevailing party even though the relief obtained "is not identical to the relief they specifically demanded, as long as the relief obtained is of the same general type." <u>P.G.</u>, 124 F. Supp. 2d at 259-60 (quoting <u>Institutionalized Juveniles v. Sec'y of Pub. Welfare</u>, 758 F.2d 897, 912 (3d Cir. 1985)).

Plaintiffs' primary goal in filing their Due Process Petition was to obtain "the consistent, uninterrupted implementation of a program of special education and related services that provides to [B.V.] a free and appropriate public education in the least restrictive environment." (Pl.'s Br. at Ex. 21 at 6 ("Due Process Petition")). Specifically, Plaintiffs

17

sought (1) immediate placement of B.V. at Newgrange School, (2) damages, special education or related services for compensatory education, and (3) "[s]uch other relief as the Court deems appropriate." (Id.)

It is undisputed that Plaintiffs failed to achieve the crux of what they sought - placement at Newgrange School. That said, Plaintiffs have satisfied the first prong of the prevailing party test. Plaintiffs' Due Process Petition resulted in the ALJ ordering that the Board (1) restore B.V.'s forty minutes per day sessions with a certified reading specialist, (2) provide a multi-sensory oriented program throughout B.V.'s curriculum and (3) determine by the Board whether or not such support can be provided in-district. (ALJ's Order at 23.) It is clear then that the ALJ deemed the restoration of certain aspects of the 2004-2005 IEP vital to providing B.V. with a FAPE. Because Plaintiffs sought a FAPE on behalf of B.V. and "[s]uch other relief as the Court deems appropriate," Plaintiffs achieved "relief . . . of the same general type" as the relief sought. See Institutionalized Juveniles, 758 F.2d at 912. Thus, the Court holds that they are a prevailing party under the IDEIA.

### b.    Causal connection between the litigation and the relief obtained

In the Third Circuit, a district court is required to determine that "there is a causal connection between the litigation and the relief [obtained] from the defendant." Holmes

v. Millcreek Twp. Sch. Dist., 205 F.3d 583, 593 (3d Cir.
2000)(internal quotations omitted).  To this end, this Court must
"assess whether the litigation represents 'a material
contributing factor in bringing about the events that resulted in
obtaining the desired relief.'"  P.G., 124 F. Supp. 2d at 260
(quoting Metro Pittsburgh Crusade, 964 F.2d at 250.)

Here, the Court finds a clear causal connection between the
litigation and the relief obtained.  The filing of the Due
Process Petition resulted in the ALJ ordering a revision of
B.V.'s 2005-2006 IEP and the restoration of a B.V.'s daily forty
minute session with a reading specialist.  The litigation also
caused the ALJ to order that the Board provide B.V. with a multi-
sensory oriented program throughout his curriculum and determine
whether the district is able to provide the ordered support or to
find a suitable out-of-district placement that does.  Thus,
Plaintiffs have satisfied the causation prong of the test.

## 2.    **Reasonableness of Attorneys' Fees**

Overall, the Court holds that Plaintiffs' recovery tips the
balance in favor of determining that they are a prevailing party.
However, Plaintiffs' moderate success at the administrative level
will be factored into the determination of a reasonable fee as
this Court examines the lodestar indicators of hourly rate and
hours expended.  Plaintiffs submit fees of $29,853.94 incurred in
matters at the administrative level (from September 30, 2004

19

through January 19, 2006).  The Board argues that, if the Court decides to award fees, the level of success achieved does not merit an award for all of the hours submitted.  The Board contends that Plaintiff should have to identify the hours spent on restoring B.V.'s forty minutes/day of one-on-one reading and the Court should reduce the fees awarded on account of the limited degree of success attained.

### a.  **Hourly Rate**

The reasonable hourly rate is determined by reference to the marketplace.  See Missouri v. Jenkins, 491 U.S. 274, 285 (1989) ("We have consistently looked to the marketplace as our guide to what is 'reasonable'.")  The attorney's customary billing rate is the proper starting point for calculating fees.  Cunningham v. City of McKeesport, 753 F.2d 262, 268 (3d Cir. 1985); Deptford Twp. Sch. Dist. v. H.B., No. 01-07842, 2006 U.S. Dist. LEXIS 14985, *14-15 (D.N.J. 2006).

In this case, attorney John Comegno, II has furnished his affidavit stating, among other things, that his hourly rate is $250 per hour and his associates bill between $175 and $150 per hour.  (Pl.'s Br. at 22.)  Mr. Comegno states that such rates are consistent with the accepted hourly rate of qualified attorneys in his area of practice, which is education law.  (Id. at ¶ 6.) He has ten years experience as a member of the New Jersey bar, and personal experience in representing parents in due process

20

hearings and mediations.  (Id. at ¶ 4.)  Burlington Township does not specifically object to any of Plaintiffs' counsel's hourly rates.

This Court finds that $250 is a generous hourly fee for such litigation in this area, but it is justified if the attorney shows the efficiency normally associated with fifteen years of specialized practice in the field.  The Court will apply the $250 hourly fee (or $175 and $150 per hour for associates, where applicable) for this case, while insisting upon the high degree of efficiency and effectiveness that an attorney rating such a fee should demonstrate.

### b.    Reasonableness of Hours

The Court's determination that Plaintiffs are "prevailing parties" entitling them to attorneys' fees under the IDEIA does not end our inquiry, however, as the Court must determine a reasonable amount of attorneys fees to which Plaintiffs are entitled.  Plaintiffs request a total of $29,853.94 in attorneys fees and costs incurred at the administrative level.  Plaintiffs have provided the Court with a fee certification in support of their request.  (Pl.'s Br. at Ex. 22.)  Because the Plaintiffs' success was moderate, however, the fee award must be reduced under the principles announced in Hensley v. Eckerhart, 461 U.S. 424 (1983); Field v. Haddonfield Bd. of Educ., 769 F. Supp. 1313, 1322 (D.N.J. 1991)(Gerry, J.)).

21

When calculating the lodestar amount, the Court must examine the record to determine that the hours billed are not "unreasonable for the work performed." Washington v. Philadelphia County Court of Common Pleas, 89 F.3d 1031, 1037 (3d Cir. 1996). In its evaluation, "the district court [must] conduct more than a cursory review of the billing records, and must 'go line, by line' through the billing records supporting the fee request." Posa v. City of East Orange, Civ. No. 03-233, 2005 U.S. Dist. LEXIS 20060, at *4 (D.N.J. Sept. 8, 2005) (citing Maldonado v. Houstoun, 256 F.3d 181, 184 (3d Cir. 2001)). Attorneys seeking fees must document the hours for which payment is sought "with sufficient specificity . . . . [W]here the documentation of hours is inadequate, the district court may reduce the award accordingly." Washington, 89 F.3d at 1037 (internal citations omitted); R.C. v. Bordentown Reg'l Sch. Dist. Bd. of Educ., No. 05-3309, 2006 U.S. Dist. LEXIS 72720, *6-9 (D.N.J. Sept. 29, 2006). When a Court is unable to differentiate services for claims that were successful from services for claims that were unsuccessful, however, the district court may consider a reduction based on the percentage of success achieved. Field, 769 F. Supp. at 1323.

In Field, the district court found that, given the general description of services rendered (e.g., "telephone call to client," "meeting," etc.), it was "unable to exclude, claim by

22

claim, services for which plaintiffs were successful and those
for which plaintiffs were unsuccessful." <u>Id.</u>  Because the
attorney's billing record "does not indicate the subject matter
of the service in any detail other than to specify" which of two
matters the services pertained to, Judge Gerry considered the
record before the court and "conclude[ed] that a reduction of 50%
of plaintiffs' gross lodestar calculation represents reasonable
attorneys fees for the litigation . . . considering the
significance of the overall relief obtained by the plaintiffs in
relation to the hours reasonably expended on the litigation."
(<u>Id.</u>)

Because this Court is also faced with a description of
services rendered that is very general, the Court will employ the
same logic as Judge Gerry in <u>Field</u>.  Here, Plaintiffs' counsel's
affidavit contains descriptions for services such as "conference
with client," "email to M and A," and "reviewed file."  In fact,
Mr. Comegno attaches sixteen pages of billing records to his
affidavit of counsel reflecting work performed at the
administrative level between September 30, 2004 and January 19,
2006.  No entry, however, contains a description specific enough
to identify it as pertaining to a certain issue or type of relief
sought.  Thus, the Court here cannot achieve an accurate picture
of which services pertain to which type of relief sought by
Plaintiffs by performing a line-by-line analysis of Plaintiffs'

counsels' billing records.  Nor has the Board pointed to time entries that are unreasonable for the services required to be performed.  This being the case, the Court will employ a percentage of reduction based on the significance of the overall relief obtained by the Plaintiffs in relation to the hours reasonably expended on the litigation.

The lodestar figure of $29,853.94 will be reduced accordingly as follows.  Here, Plaintiffs spent well over 100 hours litigating this matter before the ALJ.  No doubt substantial efforts were focused on obtaining for B.V. an out-of-district placement at the Newgrange School, which Plaintiffs did not achieve.  But much of the effort documenting the inadequacy of the Board's program was also productive of the success achieved before the ALJ in areas other than out-of-district placement.  Even if restoring certain one-on-one reading tutoring and a multi-sensory approach to B.V.'s curriculum were not the primary focus of Plaintiffs' efforts, Plaintiffs' success in these areas was reasonably related to a fair portion of the total effort.  Consequently, the Court concludes that a one-half reduction of Plaintiffs' gross lodestar calculation represents reasonable attorneys fees for the litigation before the ALJ considering the moderate overall success obtained by the Plaintiffs.  Stated differently, it can be reasonably estimated that one-half of the claimed hours were devoted exclusively to

24

out-of-district placement, upon which Plaintiffs did not succeed, and those hours are excluded from recovery, while the remaining hours were all devoted to the success achieved before the ALJ. Thus, the Court will award Plaintiffs attorneys' fees of $14,926.97.[4]

### 3.  Whether Plaintiff is barred from obtaining fee under 20 U.S.C. § 1415(i)(3)(D)

In its counterclaim, the Board seeks judgment against Plaintiff that, in accordance with 20 U.S.C. § 1415(i)(3)(D), Plaintiffs' request for attorney fees should be denied because the Board offered a settlement in October of 2005 that was ultimately denied by Plaintiffs.  Under Section 1415(i)(3)(D):

> Attorneys' fees may not be awarded and related costs may not be reimbursed in any action or proceeding under this section for services performed subsequent to the time of a written offer of settlement to a parent if–
>
> (I) the offer is made within the time prescribed by Rule 68 of the Federal Rules of Civil Procedure or, in the case of an administrative proceeding, at any time more than 10 days before the proceeding begins;

---

[4] As indicated in Plaintiffs' counsel's affidavit, Plaintiffs' attorneys' fees for the period of September 30, 2004 to January 19, 2006 amount to $30,003.94  Before reducing the amount on a percentage basis, the Court will subtract from the total amount $150 that Plaintiffs include as an expert's fee for Dr. Michael A. Comman, Ph.D.  Expert witness' fees are not recoverable pursuant to 20 U.S.C. § 1415, however.  Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy, 126 S. Ct. 2455, 2461 (U.S. 2006)("the terms of the IDEA overwhelmingly support the conclusion that prevailing parents may not recover the costs of experts or consultants.")  Thus, the amount of Plaintiffs' fees prior to the percentage reduction is $ 29,853.94.

> (II) the offer is not accepted within 10 days; and
>
> (III) the court or administrative hearing officer finds that the relief finally obtained by the parents is not more favorable to the parents than the offer of settlement.

20 U.S.C. § 1415(i)(3)(D).  To this end, the Board argues that because the Board offered Plaintiffs a settlement consisting of an hour per day of one-on-one Wilson Reading Instruction, Plaintiffs are barred from recovering attorneys' fees.  The Board submits that this offer, which was rejected by B.V.'s parents, was more favorable than the relief obtained by the parents in the ALJ's Order.

The issue is ripe for decision upon the record, since neither party has offered new evidence for the Court's consideration.[5]

The Board did send a letter to Plaintiffs offering one hour per day of reading instruction the day after the October 6, 2006 resolution session.  (Pl.'s Opp. Br. at Ex. 17 (the "Settlement Offer Letter")).  However, the letter is vague about important details of the settlement offer, and it did not address other aspects of relief Plaintiffs eventually won before the ALJ.  This

_____

[5]  While the parties' applications to the Court are properly denominated as cross-motions for summary judgment, this case presents the rather typical situation for IDEIA review of the administrative record, in which no new evidence regarding the settlement offer and the administrative decision is offered. This Court is thus empowered to decide the matter based upon the record presented.  Heather S. v. State of Wisconsin, 125 F.3d 1045, 1052 (7th Cir. 1997).

being the case, the Court cannot conclude that as a matter of
law, the settlement offer was more favorable than the ruling
obtained in the ALJ's Order; indeed, it was not.  The Settlement
Offer Letter commits the Board to providing B.V. with "one hour
per day of 1:1 Wilson Reading Instruction," but fails to state
whether the one-to-one tutoring will be performed by a certified
reading specialist (an earlier point of contention between
parties with respect to B.V.'s work with Mrs. Baldwin.)  (Id.)
Moreover, the Settlement Offer Letter does not state that the
tutoring will include a multi-sensory approach or that this
approach will be included in B.V.'s overall curriculum, which are
substantial terms of Plaintiffs' recovery in the ALJ decision.
Given the vagaries of the Settlement Offer Letter and the
critical nature of the details of the Board's offer, and its
silence as to terms upon which Plaintiffs later prevailed before
the ALJ, the Court will not bar recovery based on Section
1415(i)(3)(D).  Thus, the Court will deny the Board's motion for
summary judgment on this issue and grant Plaintiffs' motion for
summary judgment as to the Board's counterclaim.

    **B.**    **Whether the ALJ Erred in Failing to Order an Out of the
District Placement, Specifically at Newgrange School**

        **1.**    **Standard of Review**

The standard of review under which this Court considers an
appeal of a state administrative decision under the IDEIA
"differs from that governing the typical review of summary

judgment." <u>Heather S. v. State of Wisconsin</u>, 125 F.3d 1045, 1052 (7th Cir. 1997).  Indeed, when deciding an IDEIA case, a district court must apply "a modified version of <u>de</u> <u>novo</u> review" and is "required to give due weight to the factual findings of the ALJ." <u>L. E. v. Ramsey Bd. of Educ.</u>, 435 F.3d 384, 389 (3d Cir. 2006). The district court then, must "defer to the ALJ's factual finding unless it can point to contrary non-testimonial extrinsic evidence on the record."  <u>S.H. v. State-Operated Sch. Dist. of the City of Newark</u>, 336 F.3d 260, 269-70 (3d Cir. 2003); <u>Shore Regional High Sch. Bd. of Educ. v. P.S.</u>, 381 F.3d 194, 199 (3d Cir. 2004) (describing the District Court's burden as "unusual" insofar as it "must make its own findings by a preponderance of the evidence" but "must also afford 'due weight' to the ALJ's determination").  And when there is no new evidence presented to the district court, as in this case, "the motion for summary judgment is simply the procedural vehicle for asking the judge to decide the case on the basis of the administrative record." <u>Heather S.</u>, 125 F.3d at 1052 (quoting <u>Hunger v. Leininger</u>, 15 F.3d 664, 669 (7th Cir. 1994)).  Since neither party has presented new evidence, this Opinion decides the case based upon the administrative record.

### 2. **Analysis**

In their motion, Plaintiffs principally argue that the Board failed to provide B.V. with a FAPE thereby entitling him to an

out-of-district placement.  (Pl.'s Br. at 25.)  Plaintiffs argue
that the ALJ erred in not ordering such a placement because he
did not take into account the nature and severity of B.V.'s
disabilities.  Plaintiffs also argue that the ALJ failed to take
into account unrebutted testimony that B.V. is a nonreader with
significant educational needs who failed to make meaningful
educational progress in the Board's program.  (Id.)  According to
Plaintiffs, the ALJ should have ordered an out-of-district
placement at The Newgrange School.  The Board asserts that there
is no basis for overturning the factual conclusions of the ALJ.
According to the Board, the ALJ simply relied on the testimony of
Dr. Wexler and Ms. Baldwin rather than the testimony of Dr.
Silverstein and Ms. Gross in concluding that the Board provided
B.V. with an IEP that was reasonably calculated to permit him to
obtain meaningful educational progress.

     The IDEIA statutory framework imposes dual requirements on
school districts.  First, the IDEIA mandates that the school
district have "in effect policies and procedures to ensure that .
. . [a] free appropriate public education is available to all
children with disabilities . . . ."  20 U.S.C. § 1412(a)(1)(A).
"An individualized education program, . . . [must be] developed,
reviewed and revised for each child with a disability . . . ," 20
U.S.C. § 1412(a)(4), and the education of disabled students must
"to the maximum extent appropriate" be provided "with children

who are not disabled." 20 U.S.C. § 1412(a)(5)(A).  When a state fails to provide a FAPE, it must reimburse parents for resulting private school costs. L. E., 435 F.3d at 389 (quoting T.R. v. Kingwood Township Bd. of Educ., 205 F.3d 572, 577 (3d Cir. 2000)(internal quotations omitted).  Second, a disabled child must be "mainstreamed" as much as possible, meaning that the education the child will be provided "requires that a disabled child be placed in the least restrictive environment ("LRE") that will provide him with a meaningful educational benefit." L.E., 435 F.3d at 389 (quoting Kingwood Township, 205 F.3d at 578.)

The party seeking relief bears the burden of proving the appropriateness of the challenged IEP. Schaffer v. Weast, 126 S. Ct. 528, 537 (2005); see also L.E., 435 F.3d 391.  In addition, the appropriateness of a particular IEP is judged prospectively, not retrospectively. Carlisle Area School Dist. v. Scott P., 62 F.3d 520, 530 (3d Cir. 1995); Fuhrmann v. East Hanover Bd. of Educ., 993 F,2d 1031, 1040 (3d Cir. 1993)("Neither the statute nor reason countenance 'Monday Morning Quarterbacking' in evaluating the appropriateness of a child's placement.") Moreover, a FAPE "must be sufficient to confer some educational benefit upon the handicapped child, although the state is not required to maximize the potential of handicapped children. Kingwood Township, 205 F.3d at 577 (citations omitted); Oberti v. Bd. of Educ. of Borough of Clementon Sch. Dist., 995 F.2d 1204,

1213 (3d Cir. 1993)(the education provided must amount to "more than a trivial educational benefit.")  Thus, "the relevant inquiry is not whether a student's IEP confers more than a trivial benefit, nor whether the IEP confers the optimum benefit, but whether the student's IEP would confer a meaningful educational benefit upon the student."  Deptford v. H.B., Civ. No. 01-784, slip. op. at 22 (D.N.J. Feb. 15, 2002)(citing Kingwood Township, 205 F.3d at 576.)

     This Court gives due weight to the ALJ's factual findings. This is appropriate given the ALJ's ability and opportunity to review and observe firsthand the evidence and testimony of witnesses presented in the state administrative proceedings.  See H.B., Civ. No. 01-784 slip op. at 17.  Given this standard of review, the Court holds that Plaintiffs have not met their burden of proving both that (1) the ALJ erred in failing to rule that out-of-district placement was appropriate and (2) that B.V. should be placed at Newgrange School.

     In his opinion, the ALJ acknowledged that all evidence in this case leads to the conclusion that B.V. has a severe reading deficiency and suffers from serious difficulty with math and written expression.  (ALJ's Opinion at 16.)  B.V.'s reading deficit, according to the ALJ, has been attested to by the diagnostic testing, observation of experts and the observations of B.V.'s mother and it is clear that the ALJ considered all this

evidence.  (Id.)  Ultimately, the ALJ favored the Board's view of
B.V. -- that he has a severe learning disability but rejected the
idea that he is a non-reader.  The ALJ cited the "credibl[e]
testimony" of Mrs. Baldwin that she utilized a VAKT-type approach
to her tutoring of B.V., that she was a certified reading
specialist and that she uses multi-sensory aspects to the
training.  The ALJ also cited the fact that B.V. was taught in a
self-contained classroom and that he received additional reading
and speech support for at least part of the time in support of
his conclusions that the conceptual framework of the 2004-2005
and 2005-2006 IEPs were "at least significantly that which [B.V.]
appeared to require."[6]  (ALJ Opinion at 21.)

   The Court, giving due weight to the ALJ's factfinding as it
must, will deny Plaintiffs' motion for summary judgment.  The ALJ
considered at length the testimony of the experts and
psychologists hired by B.V.'s parents.  The ALJ favored the
Board's view of B.V. as a reader and concluded that the Board's
2004-2005 IEP was appropriate.  Moreover, the ALJ's thorough
review of the accounts of all B.V.'s evaluators demonstrates that
he took full account of the nature and severity of B.V.'s

_____

   [6]  The ALJ also noted that after the December, 2004 IEP
meeting, the parents did not seek out-of-district placement.
Such out-of-district placement was only sought at the April, 2005
IEP meetings when the Board also concluded that B.V.'s
independent reading instruction be reduced.

disabilities and did not ignore testimony that B.V. is a nonreader.  Thus, Plaintiffs have not met their burden of proof that B.V. should be placed out of district to obtain a FAPE.

Even if the Court concluded that the ALJ erred when he ruled that B.V. was not entitled to an out-of-district placement, Plaintiffs failed to meet their burden of proving that B.V. should be placed at the Newgrange School.  The ALJ noted that "the evidence in this case about Newgrange comes from information received during telephone calls made by [M.V.] and by Dr. Silverstein to the Newgrange School's principal."  (ALJ's Opinion at 20.)  No individual from the Newgrange School testified before the ALJ at the Due Process hearing and no affidavits or other materials attesting to the capabilities of the Newgrange School were contained in the administrative record.  The ALJ was free to give less weight to this hearsay about the Newgrange School with which the witnesses had no other personal familiarity.  Given the source of information regarding whether the school can provided the necessary programs, the ALJ correctly concluded that "an order that the Board . . . must utilize this particular facility as the place were this child is to be educated is not warranted at this time."  (Id. at 20.)  Absent credible and direct evidence about the capabilities and availability of certain programs at Newgrange, the Court holds that the ALJ did not err in deferring this decision to a later date.

33

Thus, the Court will deny Plaintiffs' motion for summary judgment as to Counts II and III of the Complaint, and finds in favor of the Board upon these points.

### C.    Whether the Board is Currently Failing to Comply with the ALJ's Order

Finally, Plaintiffs argue that the ALJ's order of January, 2006 has been and continues to be violated. In particular, Plaintiffs refer to the portion of the ALJ's Opinion that states:

> [T]he respondent must revise the IEP and provide for
> [B.V.] to have daily sessions with a certified reading
> specialist for at least forty minutes a day. If this
> cannot be arranged during the school day, it may occur
> before school. *If the district is unable to provide
> this support in-district, it must determine where such
> support may be provided.* Additionally, *the district
> must assure that [B.V.] receives a multi-sensory
> oriented program throughout his curriculum.* The
> determination of the exact approach shall be made by
> the IEP team, including the parents, but whatever
> program is settled upon must be a research-based,
> multi-sensory approach.

(ALJ's Opinion at 23)(emphasis added).

Plaintiffs first contend that the Board failed to comply with the ALJ's order requiring a daily session with a certified reading specialist for at least forty minutes a day. According to Plaintiffs, the Board did not start providing such sessions to B.V. until March 23, 2006. Moreover, according to Plaintiffs, at the end of third grade, the sessions (1) were only offered three times per week rather than five, (2) were not provided by a certified reading specialist and (3) were only offered after

school.  Plaintiffs also argue that the Board is violating the portion of the order requiring the district to (1) determine that, if it is unable to provide the ordered support, it must determine where such support may be provided and (2) assure that B.V. receives a multi-sensory oriented program.  (ALJ's Opinion at 23.)  According to Plaintiffs, the IEP team has never had a meaningful discussion regarding a research-based, multi-sensory approach.  In addition, Plaintiffs argue that the district never discussed any placement options for B.V., including Newgrange School.

The Board has not opposed Plaintiffs' contentions regarding Count IV of the Complaint or offered any arguments or facts to rebut Plaintiffs' position that the Board continues to violate the ALJ's Order.  Although unopposed, the Court does not deem it appropriate to order Plaintiffs' primary requested relief –– placement at Newgrange School –– despite the fact that the Board does not appear to be complying with the ALJ's order.  Indeed, Plaintiffs have not cited any legal authority in support of the Court's ordering this remedy, and the record regarding Newgrange School is not reliably developed here.

Nonetheless, the Board's failure to comply with the ALJ's Order is manifest.  Based upon Plaintiffs' unrebutted allegations, the Court finds:

1.   The Board failed to provide daily sessions with a reading specialist for 40 minutes per day from January 5, 2006 (the date of the final administrative decision) until March 23, 2006, a deficit of eleven weeks, 200 minutes per week, or 2,200 minutes.  Thus, B.V. failed to receive 36 hours and 40 minutes of one-to-one reading specialist instruction ordered by the ALJ.

2.   The Board failed to provide sessions, by the end of B.V.'s third grade, that were offered by a certified reading specialist, integrated into his curriculum, as ordered by the ALJ.  Assuming that this shortfall created another deficit of three months of certified, integrated reading instruction, the Board failed to provide twelve more weeks, which is another 2,400 minutes, or another 40 hours, as ordered.

3.   The Board has failed to determine whether it is capable of providing the program ordered by the ALJ, as required by his directive; if unable to provide such support, the Board must also determine where such support may be provided, and it has not done so.

4.   The Board has failed to meaningfully discuss and settle upon a research-based, multi-sensory program, as directed by the ALJ.  No meaningful discussions have occurred.

Against this background of Board indifference to the ALJ's lawful order, this Court will exercise its authority to compel compliance. See Jeremy H. v. Mount Lebanon School Dist., 95 F.3d 272, 278-79 (3d Cir. 1996)("In the present case, whether or not an IDEA decision of a state hearing officer or appellate body is enforceable under IDEA directly, such a decision would seem to be enforceable [42 U.S.C. § 1983]")(citing Robinson v. Pinderhughes, 810 F.2d 1270 (4th Cir. 1987)); C.H. v. Jefferson Twp. Board of Education, No. 05-39, 2005 U.S. Dist Lexis 35555, *17 (D.N.J. Dec. 20, 2005). Id. at 278.  Such compliance is also implicit in the Plaintiffs' prayer for relief in Count IV, wherein Plaintiffs have alleged that the Board failed to comply with the ALJ's Order, and continues to do so.  (Compl. ¶¶ 79-80.)  It is only if the district is unable to provide the ordered services in-district that it must then determine where such support may be provided out of district, according to the ALJ's Order.  (ALJ Opinion at 23.)

The record is unclear, however, whether the Board is unable to provided the indicated support, or is able to do so but "dropped the ball."  The Board will be required to address this forthwith.

Thus, the Court will order that the Board immediately comply with the ALJ's order to (1) determine whether the district is able to provide the ordered support and, if not, identify the

37

out-of-district program where such support will be provided, and
(2) assure that B.V. receives a multi-sensory oriented program.
Further, the Board shall indicate (3) precisely how it intends to
compensate for the total of the 2006 deficit of 76 hours and 40
minutes of one-to-one sessions with a certified reading
specialist, integrated into B.V.'s curriculum, using the
research-based, multi-sensory approach.  The Board shall file an
affidavit with the Court within twenty (20) days of the entry of
the accompanying Judgment stating that they have complied with
the ALJ's order and specifically indicating the Board's efforts
going forward to satisfy each of these requirements.  In
addition, the Court will hold a compliance hearing regarding this
matter on July 24, 2007 at 9:30 a.m., to assure that the Board
has satisfied this mandate.

### III. <u>CONCLUSION</u>

For the reasons stated above, the Court will grant in part
and deny in part Plaintiffs' motion for summary judgment and
grant in part and deny in part the Board's motion for summary
judgment, finding as follows.  First, the Court holds that
Plaintiffs are a "prevailing party" but given Plaintiffs'
moderate success before the ALJ, the Court will reduce the
lodestar of Plaintiffs' requested amount of attorneys' fees by
one-half, from $29,853.94 to $14,926.97 as a partial fee award,
to be paid to Plaintiffs within twenty (20) days.  Second, the

Court holds that the ALJ did not err when he failed to order an out-of-district placement or a placement at Newgrange School for B.V.  Third, the Court will grant summary judgment in favor of Plaintiffs with respect to the Board's counterclaim, finding Plaintiffs are not barred from seeking attorneys' fees for services before the ALJ, because Plaintiffs' relief was more substantiated than that offered by Defendant's settlement proposal.  Finally, the Court will not order that B.V. be placed at Newgrange School, as requested by Plaintiffs, due to the Board's failure to comply with the ALJ's order.  Rather, this Court will require that the Board immediately comply with the ALJ's order with respect to (1) determining whether the district is able to provide the ordered support and, if not, indicating the out-of-district program where this support will be provided, (2) assuring that B.V. receives a research-based, multi-sensory oriented program, and (3) indicating precisely how it will compensate for the 2005-06 deficit of 76 hours, 40 minutes of one-on-one sessions with a certified reading specialist, integrated into B.V.'s curriculum, using the research-based multi-sensory approach, all to be certified in an affidavit on behalf of Defendant within twenty (20) days hereof.  The Court will hold a compliance hearing on this matter on July 24, 2007 at 9:30 a.m., to assure that the Board has complied with these mandates.

Finally, any motion for attorney's fees and costs pertaining to this Court phase of the case (i.e., from January 31, 2006 until the conclusion of the compliance hearing) shall be filed within ten (10) days after the conclusion of the compliance hearing and conform to the form and specificity required by L. Civ. R. 54.2(a) & (b).

The accompanying order is entered.


**June 27, 2007**          **s/ Jerome B. Simandle**
Date                       Jerome B. Simandle
                           United States District Judge